## COAL & IRON RY. CO. v. REHERD.

(Circuit Court of Appeals, Fourth Circuit. February 11, 1913.)

No. 1,077.

1. CONTRACTS (§ 231*)—CONSTRUCTION—PRICE—CONSTRUCTION CONTRACT—EXCAVATION—"EARTH."

Where a railroad construction contract divided material to be excavated into earth, loose rock, and solid rock, and provided that the term "earth" should cover all clay, sand, gravel, loam, and all earthy material containing loose stones and boulders of not over three cubic feet, such provision was plain and unequivocal, not subject to explanation by parol, and as matter of law included a substance encountered, called "gumbo," or "bull-wax," which was a form of clay; and hence the court erred in refusing to charge that such material was within such

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

classification, and that plaintiff was only entitled to recover the price fixed by the contract for the excavation of earth or its removal.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1046, 1047, 1051, 1052; Dec. Dig. § 231.*

For other definitions, see Words and Phrases, vol. 3, p. 2304.]

2. CONTRACTS (§ 170*)—CONTEMPORANEOUS CONSTRUCTION—CHARACTER OF MATERIALS.

Where a railroad construction contract provided that it should not be affected by any verbal agreement or inferences drawn from conversations had on the subject, and by its express terms certain "gumbo" found by the contractors in the course of their excavation was within the contract definition of the term "earth," and payable at the price specified for the excavation of earth, the fact that the railroad company's engineers had verbally promised that the contractors should be paid a higher price for the excavation of the "gumbo," and had allowed a higher price in certain of the specifications, did not constitute such a contemporaneous construction of the contract as would entitle plaintiff to recover a higher price therefor in an action on the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 753; Dec. Dig. § 170.*]

3. CONTRACTS (§ 303*)—PERFORMANCE—UNEXPECTED DIFFICULTIES.

Unexpected difficulties, which a contractor encounters in the performance of a particular piece of work at a stated price, do not excuse him from the obligation of his contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1409–1443; Dec. Dig. § 303.*]

4. CONTRACTS (§ 232*)—COMPENSATION—CONSTRUCTION CONTRACT—CHANGE OF LINE—ESTIMATES BY ENGINEERS.

Where a contract for railroad construction provided for payment on the last day of each month during the progress of work on an estimate by the engineer in charge, and that all claims for extra work shall be filed before the end of the month during which the work was done and be at once adjusted, and that the decision of the consulting engineer in case of dispute should be final and conclusive, the parties waiving any right of action, suit, or other remedy at law or otherwise, estimates and classifications of quantities of work made by the engineers covering a change in a part of the line provided for by the contract, for which no claim for extra work was ever filed by the contractors, were conclusive against their right to recover additional compensation therefor, in the absence of a showing of fraud, gross mistake, or bad faith on the part of the engineers.

[Ed. Note—For other cases, see Contracts, Cent. Dig. §§ 1071–1094; Dec. Dig. § 232.*]

5. CONTRACTS (§ 287*)—RAILROAD CONSTRUCTION—ESTIMATES AND CERTIFICATES BY ENGINEERS—CONCLUSIVENESS.

Where a railroad construction contract provided that the bids for excavations should include a haul of 800 feet, and that the contractors should be allowed extra for overhauls amounting to 100 feet or more, and also provided for payment on engineers' estimates, and that the determination of the engineers should be conclusive in matters of difference, the work in connection with overhauls having been estimated and certified by the engineers as the work progressed, the contractors were concluded thereby, in the absence of fraud, gross mistake, or bad faith.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1308, 1309, 1312–1316, 1318–1338, 1340–1342, 1344–1346, 1348, 1350, 1351; Dec. Dig. § 287.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6.** EVIDENCE (§ 448*) — WRITTEN INSTRUMENTS — INTERPRETATION — PAROL PROOF.

Where a railroad construction contract provided that prices fixed for excavation should contemplate a haul of 800 feet, and that, if the average haul exceeded that distance, an additional sum per cubic yard for each additional 100 feet of increase should be allowed, such provision was plain and definite, and parol evidence was inadmissible to aid in its interpretation.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2066-2082, 2084; Dec. Dig. § 448.*]

**7.** DAMAGES (§ 85*)—LIQUIDATED DAMAGES—CONSTRUCTION CONTRACT—ADDITIONAL WORK—DELAY.

Where a railroad construction contract provided for forfeiture of $50 a day as liquidated damages for the contractors' failure to complete the contract within the period specified, the fact that the railroad company, by changing the line, necessitated the performance of additional work, while giving the contractors the right to a reasonable extension in which to perform the same, did not relieve them from liability for the penalty in so far as it applied to unnecessary delay in completing the contract.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 179-181, 183-187; Dec. Dig. § 85.*]

**8.** RECEIVERS (§ 210*)—AUTHORITY—TERRITORIAL EXERCISE.

A receiver appointed by a state court has no jurisdiction as a matter of right to exercise functions outside the state of his appointment, and without more may not institute a suit in a federal court sitting in another state.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 417-420; Dec. Dig. § 210.*]

**9.** RECEIVERS (§ 210*)—AUTHORITY—SUIT IN FEDERAL COURT—PROCEEDINGS TO ACQUIRE AUTHORITY.

A receiver of certain railroad contractors, having been appointed by a Virginia state court, without authority instituted an action against defendant railroad company in the United States Circuit Court for the Northern District of West Virginia. Thereafter the receiver filed an ancillary bill in the state court of West Virginia, under which an order ratifying his appointment as receiver was made, and by which he was authorized to intervene and prosecute as a party plaintiff and as receiver the action pending in the federal court, which he had previously brought, with full authority, etc. *Held* that, though such proceedings were irregular, they were sufficient to entitle plaintiff to continue the suit as though a new suit had been instituted.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 417-420; Dec. Dig. § 210.*]

**10.** COURTS (§ 311*)—FEDERAL COURTS—RESIDENCE OF PARTIES—RECEIVERS.

Where the receiver of a partnership authorized to sue was a citizen of another state, his right to maintain an action in the federal courts by reason of diversity of citizenship was not affected by the reason that one or more of the members of the firm were citizens of the state in which the action was brought.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 858; Dec. Dig. § 311.*

Citizenship as affecting the jurisdiction of the federal courts, see note to Shipp v. Williams, 10 C. C. A. 253.]

Pritchard, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton and John C. Rose, Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Peter W. Reherd, as receiver of the late firm of Walton, Purcell, Moorman & Co., against the Coal & Iron Railway Company. Judgment for plaintiff, and defendant brings error. Reversed.

This action was commenced by service of summons on the 21st of March, 1904, and the declaration was filed on the 4th of April, 1904. The Coal & Iron Railroad Company of West Virginia is a corporation organized under the laws of the state of West Virginia, and Walton, Purcell, Moorman & Co. is a partnership composed of S. Walton, E. Purcell, Jr., M. N. Moorman, Jr., W. H. Rickard, D. C. Reherd, and P. W. Reherd. The said railroad company set about in the year 1900 to construct a railway line, to be called the Coal & Iron Railway of West Virginia, from the town of Elkins to the forks of the Greenbrier, in the county of Pocahontas, in the said state of West Virginia, and in order to facilitate the construction of the said railway it was divided into three divisions, as follows: The first division extending from the main track in South Elkins to the north end of tunnel, section No. 1, a distance of about 4½ miles, including the Valley River Bridge. The second section extended from the south end of tunnel No. 1 to the north end of tunnel, section No. 2, about 19 miles in length, and including the bridge across Shavers fork of Cheat river. The third division extended from the south end of tunnel, section No. 2, to the forks of the Greenbrier, a distance of about 19 miles. Altogether about 42½ miles.

On the 1st day of May, 1900, the said railway company entered into a contract with the firm of Walton, Purcell, Moorman & Co., as follows:

"Articles of agreement, made and completed this 1st day of May, in the year 1900, A. D., between the Coal & Iron Railroad Company of West Virginia, of the first part, and S. Walton, E. Purcell, Jr., M. N. Moorman, Jr., W. H. Rickard, D. C. Reherd, and P. W. Reherd, trading under the name of Walton, Purcell, Moorman & Co., of the second part, witnesseth, that for and in consideration of the payments hereinafter named, to be made by the party of the first part, the said party of the second part hereby agrees to perform all the work hereinafter described, in a thorough and workmanlike manner, on or before December 15, 1900, as to division No. 1, and March 1, 1901, as to divisions No. 2 and No. 3, which time shall be of the essence of this agreement.

"And it is understood that these articles of agreement cover the following described work involved in the construction of the Coal & Iron Railway of West Virginia, and which is illustrated in the profiles and approximate quantities, on file in the office of the engineer in charge, at Elkins, W. Va., viz.: All the graduation, masonry, etc., between the junction with the main track of the West Virginia Central Railway, in South Elkins, and the north end of tunnel No. 1, known as 'Division No. 1'; all graduation, masonry, etc., between the south end of tunnel, section No. 1 and the north end of tunnel, section No. 2, known as 'Division No. 2'; and all the graduation, masonry, etc., between the south end of tunnel, section No. 2, and the forks of the Greenbrier river, it being understood that the southern terminus of the line may vary within a limit of three or four miles in its extent, known as 'Division No. 3,' complete to subgrade, viz.: All grubbing, clearing, excavation, embankment, masonry of all kinds, including foundations to same; all necessary removal and reconstruction of county roads and diversion of streams; also all tunnel work which may be needed, excepting the two tunnels known as No. 1 and No. 2, which are already provided for under a separate contract. All work to be done in accordance with the following specifications and such drawings as may be furnished, from time to time, explanatory of the work, and to the satisfaction of the engineer in charge and of the consulting engineer.

"Specification.

"Graduation.—Under this head will be included all cuts, fills, ditches, water courses, changing of county roads, clearing, grubbing, etc., connected with and incident to the construction of the Coal & Iron Railway.

"First, Clearing and Grubbing.—Shall extend to a point at least fifteen feet beyond the slope stakes, measured horizontally, on both sides of the line. In embankment under three (3) feet deep the stumps shall be grubbed.

from 3 to 5 feet, cut close to the ground, and above 5 feet cut off, to stand not over two (2) feet high above the ground. All these materials, including trees, brush, and vegetable growth of all kinds, must either be removed beyond the fifteen feet line or burned on the spot.

"Second, Excavations.—The roadbed shall be eighteen (18) feet wide, with ditches, in cuts, and fourteen (14) in fills, and the slopes shall be such as the nature of the material may require, in the judgment of the engineer in charge. The embankments shall be made from the cuts, but should the normal cuts furnish an insufficient amount of material for the construction of the fills, they, the cuts, may be either widened or outside borrow pits may be provided, as seems best to the engineer in charge. These same methods shall apply in the case of the construction of county roads, in water courses, ditches, etc. In case the normal cuts are more than sufficient to make the normal fills, the surplus shall be consumed either in widening the regular fills or placed in spoil banks, as the engineer in charge may direct. For all this work under the head of 'Graduation,' inclusive of cleaning and grubbing, there shall be no classification, and but one price per cubic yard shall be paid for all material actually excavated, under the above heads, said price to cover its transportation or haul to the point of final deposit. As stated, all material shall be measured and paid for in excavation before disturbance. Cases may, however, arise when it may be necessary to measure material (in embankment); this would, however, be exceptional.

"It must be understood that the embankment between the Tygart Valley river bridge and South Elkins must be made of material brought across the river from the south side, with the bridge masonry in place. This would require a light trestle 220 feet long. Should it, however, be desired by any one bidding on this work so to do, a classified bid will be accepted as follows:

"Excavation—Earth————Per cubic yard.
          "          —Loose rock—          "
          "          —Solid rock—          "

"Prices to be on an average haul of not over 800 feet in the limits of the contract. Should the average haul exceed 800 feet, then add for each 100 feet additional so much per cubic yard, but nothing less than 100 feet increase shall count.

"Grubbing and clearing per acre, so much.

"Earth—Shall Cover.—All clay, sand, gravel, loam, and all earthy material containing loose stones and boulders of not over three cubic feet.

"Loose Rock—Shall Cover.—All stones in adjoining, but detached, masses over three cubic feet, but not over one cubic yard in size; also all slate and other rock which can be quarried without blasting, although blasting may be resorted to; also cemented gravel, which must be blasted.

"Solid Rock—Shall Cover.—All rock in masses of over one cubic yard, which cannot be removed without blasting.

"The above prices, as in the case of the unclassified bid, shall apply to all material actually excavated in connection with the construction of the railway; it being understood that the party of the first part shall decide whether to accept the classified or unclassified bid, the said decision to be embodied in this contract as shown in the price list further on.

"Masonry.

"Materials.— The quality of the stone, cement and sand used must be satisfactory to the engineer in charge and to the consulting engineer, and if under any circumstances bricks should be used, they must in like manner be approved of. All materials are subject to actual test, and if condemned must be removed from the work.

"Workmanship.

"First-Class Masonry.—This shall be the best quality of cut and coursed work. No course shall be less than twelve inches nor more than thirty inches thick. No stone shall have less than fifteen inches bed, and shall always have at least as much bed as rise. No stretcher should be less than three nor more than six feet long; the headers shall run through and through any wall not over four (4) feet thick, and in the case of channel piers shall

run through and through when the said piers are not over five (5) feet thick, and shall then be double headers; when the headers do not run through, they shall lap at least one foot in the heart of the wall and shall hold their size well back; the headers shall constitute one-fourth of the face of the wall, and each header shall be at least as wide as high. All stone shall be cut accurately to size with parallel beds and out of wind; a pitched draft shall be run around the face of all ashlar, with a rock face of not over three (3) inch projection beyond the draft line where line is above ground. All joints shall be cut squarely in, from the pitched line, at least eight inches. All stone must break joint at least twelve (12) inches either in the face or heart of the wall. Wherever backing is used, the beds must be cut as carefully as with ashlar, but the sides and ends may be shaped up to fit the spaces with the hammer. All stone must be laid on their natural or quarry beds, as close together as possible, and always with the broadest bed down. All vacancies between stone must be tightly packed with small stuff set in cement, or with three-quarter inch broken stone or gravel concrete, as may be decided by the engineer in charge. (Rules for mixing, see below.)

"The wall must be absolutely solid and without vacancies. Coping shall not be less than fifteen (15) nor more than eighteen (18) inches thick, and in as large blocks as possible—nothing less than 3x4. In the case of channel piers the coping must run clear across with three (3) inch projection on each side. In the case of bearing blocks for iron bridges the blocks must be carefully cut all over and bush hammered (ten cut on the upper bed) to receive the iron bed plate. Iron clamps set in lead may be used in the coping of channel piers, if thought necessary by the engineer in charge. Cement mortar used shall be made of some approved brand of domestic cement and clean sharp sand, cement 1, sand 2, by volume, mixed dry, then water added, as needed only, so as to get the advantage of the first set. Should concrete be used it will be made: cement 1, sand 2, two inch broken stone 4, stone to be spread on a plank floor in a six inch layer, then the mortar made and spread over the stone, and the whole turned by hand three times. Wet the stone before putting on the mortar. In placing the concrete it must be laid in eight (8) inch layers and rammed with twenty pound rammers until the contained water floats on the surface. In this class of work the joints shall be as thin as possible, and shall never exceed one-half (½) inch in thickness. They shall be raked out one (1) inch deep the day they are made, and on the completion of the work shall be pointed flat with Portland cement mortar of approved brand, mixed half and half. The above class of work shall apply in general to all river bridges, and wherever else it may be ordered by the engineer in charge or the consulting engineer. The price bid shall be per cubic yard of twenty-seven cubic feet, and shall be based upon the actual cubical contents. No conventional method of measurement will be allowed. The price shall cover the entire work, including foundations to a depth of five (5) feet below the average bottom of the stream, within the area of the pier or abutment, the body of the masonry, the coping and pedestal blocks where used.

"Second-Class Masonry.—This may be either coursed or uncoursed work, laid in cement. Stone may vary from six (6) inches to two (2) feet in thickness; stretchers not less than eighteen (18) inches in length nor more than four (4) feet; headers to be not less than two and one-half (2½) feet long, and to hold their size well back, and shall be as wide as high at the face of wall; no stone to have less than twelve inches depth of bed and never less than its own rise. The headers must make one-fourth of the face area of the wall. All ashlar shall be rock-faced, cut with parallel beds, out of wind, and a pitched draft run around the face of each stone, from which the joints shall be cut squarely back at least six inches—the backing may be shaped up with hammer only; all stone shall break joint at least eight (8) inches, whether in the face or heart of the wall, and all stone shall be laid on the quarry bed. All vacancies shall be tightly filled with sprawls in cement or concrete, as may be ordered. This class shall be laid in cement and pointed up as in first-class work, and the same rules shall govern the making of mortar and concrete as in first-class work.

"Second-Class Masonry shall be applicable to important culverts, box or arched, and wherever else ordered by the engineer in charge. In the case of box of gothic culverts, the top course of the side walls must be selected stone, not less than two and a half (2½) feet by three (3) and not less than nine (9) inches thick, the corbel stone, when used, selected of the same size from 9 to 12 inches thick, and the cover stone 12 to 15 inches thick and large enough to lap the main walls 12 inches, or where corbel stones are used 6 inches. The coping of head walls shall be from nine to twelve inches thick and the stone shall be cut all over and pitch drafted with a rock face. In all culverts the foundations of the head walls shall be carried across the waterway to their full depth, and the waterway shall be paved with good heavy stone on edge from head wall to head wall. The price per cubic yard for second-class masonry shall cover the cost of all foundations to a point five (5) feet below the average level of the bottom of the stream crossed. and the various kinds of work involved, such as the rise of the wall, the cover and corbel stone, the coping, the paving, etc.

"In the case of arched culverts the side walls, head walls, spandrels, etc., shall be as described above, of second-class masonry, the ringstone and sheeting must be cut as per plan given. Hence, a special price per cubic yard will be named for springing course, ringstone and sheeting alone, when used in arched culverts, the balance of the masonry being estimated at second-class prices.

"Third-Class Masonry.—This shall be coursed or uncoursed masonry, shaped with the hammer and laid *dry*. All the rules governing size of stone, bond, proportion of headers, manner of laying and depth of foundation, which are specified under the head of second-class work shall hold good here, mortar excepted. This class may be used in small culverts, support walls, etc., when ordered by the engineer in charge. The price per cubic yard shall cover the work in place and completed.

### "Riprap.

"As in special cases it may be necessary to protect an earthen embankment from wash by a covering of stone, a price per cubic yard will be given for such material in place, said protection to consist of rough stone carefully laid close together, well bonded and of such size as the engineer in charge may direct. not exceeding what two men can handle with bars, down to one-half a cubic foot in size.

### "Foundations.

"Where required to be excavated below the five (5) feet line mentioned above, shall come under the following heads and be paid for per *cubic yard* of actual material excavated, which price shall cover all timbering, pumping, bailing, etc., connected with the work, as well as the transportation of the material excavated to some designated place of deposit.

"First. Earth, gravel, sand, clay, hard pan, boulders, and anything which can be handled without explosives.

"Second. All solid rock 'in situ' *requiring* explosives.

"If permanent timbering is required in foundations for grillages, 'etc.,' it shall be the best quality of dimensioned white oak, subject to inspection, and a price per thousand feet B. M. shall be named for it, furnished, framed, pinned, or bolted in place as required.

"If piles are to be used they shall be of such size as may be called for by the engineer in charge, not exceeding eighteen inches at the butt, of white oak, straight, sound, and subject to inspection. A price shall be named per lineal foot driven and cut off, and, should iron shoes be used, a price per pound for cast shoes shall be given. In rendering estimates the neat lengths of piles when cut off shall be used.

### "General.

"Embankments may be made in layers or entirely by end dumping as the engineer in charge may direct. but in filling over culverts and against bridge abutments great care must be taken not to *dislocate* the masonry, the material must be put on in layers, and as ordered by the engineer in charge.

"Passing places for all public and private roads must be provided and kept

in good condition by the contractor, who shall also open a horse track along the entire length of his contract at his own expense. He shall also keep up any fences necessary to the protection of crops which may be endangered by the work.

"All cuts and fills shall be neatly finished to the slopes and subgrades given by the engineer in charge, and the subgrade shall slope 1 inch in 4 foot from center to sides for drainage.

"The alignment, grades, and disposition of material may be changed from the plans at present existing, without prejudice to this agreement. If it can be shown to the satisfaction of the engineer in charge and the consulting engineer that such changes will add to the cost per cubic yard of excavation handled, then such an extra allowance may be made by the consulting engineer as will reimburse the contractor; but, should the said change decrease the cost of the work to the contractor, he shall be charged with the difference. Any such changes shall be embodied in a supplementary agreement.

"Any one bidding on this work is expected to visit the line and examine it thoroughly, and a statement to that effect must be made in the proposal. It is also understood that any estimate of quantities submitted to bidders by the railway company is only approximate.

### "Discipline.

"Good order must be maintained among the men employed in the work by the contractor, whether off or on the line, and the contractor shall discharge any man in his employ at the request of the engineer in charge, and shall be responsible for any damages inflicted by his employés upon persons or property, and the consulting engineer is authorized to withhold his estimates until satisfaction is made.

### "Transfer.

"The contractor shall not transfer or sublet any part of his contract without the written consent of the consulting engineer, and shall give his personal attention to the work.

"The work shall be prosecuted entirely under the direction of the engineer in charge, who, with the approval of the consulting engineer, shall have the power to direct the increase or diminution of the force and the points of its application.

"And it is expressly agreed that the times herein named for the completion of this contract, viz., December 15, 1900, and March 1, 1901, are of the essence of this agreement, and if at any time it should be the opinion of the engineer in charge that the work is not being prosecuted with sufficient force or energy to secure its completion in the time named, he shall notify in writing the party of the second part (the contractor) to increase the force and facilities in ten days, at the end of which period, and in case of noncompliance with said instructions, it shall be the duty of the engineer in charge to employ such laborers, teams, and foremen as he may deem necessary to complete the work within the time named, at such wages as he may find it necessary to pay all men and teams so employed, and charge the amount so paid against the party of the second part, as a payment on account of work done under the agreement. Or in case the engineer in charge should deem it best, he may, with the consent of the consulting engineer, declare the agreement, in part or whole, forfeited, which declaration and forfeiture shall exonerate the said party of the first part from any and all obligations and liabilities arising under this agreement, as though it had never been made, and the reserved percentage, if any, on work previously done, may be retained forever by the party of the first part, and used for the completion of the contract. And in case the party of the second part is bonded, then the bondsmen or bonding company shall be liable to the extent of the amount of the bond for the execution and completion of the work.

"And it is further agreed that the party of the second part shall provide and put in practice all necessary safeguards and precaution against accidents and damages to any person or property during the prosecution of the work, and shall indemnify and save harmless the said party of the first part and

its engineers from the payment of all sums of money by reason of any such accidents and damages.

"It shall be the duty of the engineer in charge to give all needed stakes, heights, lines, and dimensions necessary to the prosecution of the work, and it shall be the duty of the contractor to preserve the same.

"This contract shall not be affected by any verbal agreements or inferences drawn from conversation had upon the subject.

"The contractor agrees to do all the work described to the satisfaction of the engineer in charge and consulting engineer, and to accept their decision as to quantities, classification, 'etc.,' as final, and from which no appeal shall be taken. When the term 'engineer in charge' is used, it means the railway company's engineer in charge of the work of the entire line for the time being, and who will personally direct its execution with the advice and under the supervision of the consulting engineer.

"And it is understood that the party of the second part shall give bond for the faithful execution and completion of the work in some acceptable bonding company, to the extent of the estimated value of the contract, and which in this case calls for a bond of fifty thousand dollars.

"And it is further understood that for each and every day required in excess of the date named for the completion of this contract the sum of fifty dollars shall be paid by the party of the second part to the party of the first part, which shall be considered as liquidated damages. Or should the party of the second part anticipate the date of the completion, then the party of the first part shall pay the party of the second part fifty dollars for every day so saved.

"In consideration of the above, the party of the first part shall pay the party of the second part, for work done under this agreement, the following prices:

For first-class masonry, per cubic yard............................. $ 9 00
For second-class masonry, per cubic yard.......................... 6 75
For third-class masonry, per cubic yard........................... 3 50
For spring course, ringstone, and sheeting of arched culverts, per
    cubic yard.................................................... 11 00
For riprap...................................................... 1 00
For concrete in mass............................................ 5 00
    "    " in arches.......................................... 7 50
For tunneling................................................... 2 80
For permanent timber trestle work, per 1,000 B. M. of white oak.... 27 00

### "Foundation Work Below the 5 Foot Line.

Earth, gravel, sand, clay, hard pan, boulders, etc., per cubic yard.... 1 00
Solid rock requiring explosives, per cubic yard.................... 1 30
Permanent timber work, grillages, platform, etc., per 1,000 B. M..... 26 00
Piles driven and cut off, finished lengths, per lineal foot........... 37¢
If cast or wrought iron shoes are used, per pound.................. 05¼¢

### "Classified Work.

Excavation, earth, per cubic yard................................. 20¢
Excavation, loose rock, per cubic yard............................ 35¢
Excavation, solid rock, per cubic yard............................ 68¢
With average haul not over 800 feet.

### "Average Haul Over 800 Feet.

Not applicable until 100 feet in excess is reached, per 100 feet per
    cubic yard................................................... 01½¢
Clearing and grubbing per acre................................... 30 00

"Payments to be made in the following manner: On the last day of each month during the progress of the work an estimate shall be made of the value of all work done, by the engineer in charge, to date. Of this amount ninety per cent. shall be paid to the party of the second part, less any previous monthly estimates which might have been paid on the same work; said

payments shall be made on or about the 15th of the following month. And when all the work embraced under this agreement shall be completed, according to this specification and to the satisfaction of the engineer in charge and the consulting engineer, a final estimate shall be made, and any balance appearing to be due to the party of the second part shall be paid to it within thirty days thereafter, provided the party of the second part shall give a release under seal to the party of the first part from all claims and demands growing out of this agreement, and upon procuring and delivering to the party of the first part full releases, properly executed, from all materialmen and the exhibit of receipted pay-rolls, of mechanics and laborers connected with or employed on the work. It is hereby understood that the work will be accepted as completed by divisions only, nothing less, and in order 1, 2, 3, and that each division must be dressed up throughout before acceptance.

"Extra Work.

"All claims for extra work must be filed before the end of the month during which the work was done, and shall at once be adjusted.

"And it is mutually agreed that the decision of the consulting engineer shall be final and conclusive in any dispute which may arise between the parties to this agreement, and each and every one of said parties do hereby waive any right of action, suit or suits, or other remedy in law or otherwise, by virtue of said covenants, so that the decision of the said consulting engineer shall, in the nature of an award, be final and conclusive on the right and claim of said parties.

"In witness whereof, the parties herein named have hereunto set their hands and seals the day and year herein first above named, and both parties to the agreement testify that they have read and understand all the provisions of the same.

"[Signed]                          Coal & Iron Railway Co.,    [Corporate Seal.]
        "By H. G. Davis, Its President.
"Witnesses: C M. Hendley, Secretary.

|  |  |
|---|---|
| "S. Walton. | [Seal.] |
| "E. Purcell, Jr. | [Seal.] |
| "W. N. Moorman, Jr. | [Seal.] |
| "W. H. Rickard. | [Seal.] |
| "D. C. Reherd, | |
| "Per W. H. Rickard. | [Seal.] |
| "P. W. Reherd, | |
| "Per W. H. Rickard. | [Seal.] |

"Witness: Chas. S. Robb."

Shortly after the contract was consummated the contractors entered upon the work, and completed the first division on the 14th of August, 1901, the second division on the 2d of February, 1903, and the third division on the 20th of November, 1902. During the progress of the work estimates were made by the engineers as provided in the contract, and the amount under the estimates and classifications, less 10 per cent., was paid by the defendant to the contractors, and accepted by the latter. In the course of the work the line as originally contemplated was changed in some respects, but the estimates and prices were made and paid upon the same basis as provided in the contract. On the 12th day of December, 1903, some time after the work had been finished, P. W. Reherd, D. C. Reherd, E. Purcell, Jr., Martin N. Moorman, and Samuel Walton filed a complaint in the circuit court of Rockingham county, state of Virginia, against W. H. Rickard, alleging that the partnership of Walton, Purcell, Moorman & Co. had entered into a contract with the Coal & Iron Railway Company, and had completed the contract, and that there was a considerable sum still due; that there was a suit pending in the said Rockingham county by one of the subcontractors for work done against the said partnership, and that the said partnership had been unable to obtain a satisfactory settlement from the Coal & Iron Railway Company, etc.; and that there were outstanding moneys on account due the said partnership, as well as effects belonging to the said partnership, and that it

was necessary to have a receiver for the said partnership to wind up its affairs: and thereupon P. W. Reherd was appointed receiver for the said partnership of Walton, Purcell, Moorman & Co.

As above stated, the present suit was commenced on the 21st of March, 1904, and thereafter, on the 15th day of January, 1906, these same complainants filed an ancillary bill against the same defendant W. H. Rickard, in the circuit court of Randolph county, W. Va., and on the 25th of January following Peter W. Reherd was appointed receiver of the partnership of Walton, Purcell, Moorman & Co., and in the order of appointment is the following: * * * And with authority to him to intervene and prosecute as party plaintiff, and as receiver, as hereinbefore described, in the action of assumpsit pending in the Circuit Court of the United States for the Northern District of West Virginia, entitled Peter W. Reherd, Receiver, v. Coal & Iron Railroad; and he shall have full authority as receiver, appointed by this court, to intervene as party plaintiff in said action, according to the rules of pleading in the Circuit Court of the United States for the Northern District of West Virginia."

The several items of alleged indebtedness sought to be recovered by the plaintiff from the defendant are as follows:

### First Division.

| | |
|---|---|
| For alleged error in yardage and classification | $31,099 97 |
| For temporary bridge at Elkins | 2,000 00 |
| For overhaul | 16,909 28 |
| Making | $50,009 25 |

### Second Division.

| | |
|---|---|
| For excavating and removing 300,000 cubic yards of gumbo | $90,000 00 |
| For change in line | 3,377 00 |
| Making | $93,377 00 |

### Third Division.

| | |
|---|---|
| For excavating and removing 32,000 cubic yards of gumbo | $28,201 25 |
| For change in line | 5,000 00 |
| Retained percentages | 45,423 00 |
| Making | $78,624 25 |

The case was tried in January, 1911, and the jury returned a general verdict for the plaintiff, and assessed damages at $245,806.81, and further to special interrogatories answered as follows:

First Division. For material excavated over and above that estimated and allowed by the defendant company's engineers $15,549.98, with interest from March 15, 1903, at 6 per cent., $7,334.41, making $22,884.39.

For material excavated on Adams work on the second division over and above what was estimated and allowed by the defendant company's engineers $90,000, with interest from March 15, 1903, at 6 per cent., $42,450, making $132,450.

On the claim under the head of Dennis work the jury found there was due plaintiff $3,377, with interest from March 15, 1903, at 6 per cent., $1,592.82, making $4,469.82.

For material excavated and work done at Summit Cut on third division over and above the amount estimated and allowed by defendant's engineers $23,445, with interest from March 15, 1903, at 6 per cent., $11,058.28, making $34,503.28.

For change of line on the third division the jury allowed the plaintiff $5,000, with interest from March 15, 1903, at 6 per cent., $2,358.33, making $7,358.33.

For overhaul on the first division plaintiff was allowed by the jury $12,574.26, with interest from March 15, 1903, at 6 per cent., $5,930.84, making $18,505.10.

For retained percentages plaintiff was allowed by the jury $17,079.89, with interest from March 15, 1903, at 6 per cent., $8,056.00, making $25,135.89.

The aggregate of these amounts make $245,806.81, which constitute the damages allowed by the jury.

It will thus be seen that the jury returned their verdict for $167.026.13, principal money, and $78,780.68, interest. The items of principal were composed, as above stated, of amounts allowed for material excavated on first division over and above that allowed by defendant's engineers $15,549.98; for material excavated on the Adams work on the second division over and above that allowed by defendant's engineers $90,000; for claim under head of Dennis work $3,377; for material furnished and work done on excavations at Summit Cut $23,445.00; for change of line on third division, $5,000.00; for overhaul on first division, $12,574.26; for retained percentages, $17,079.89. Judgment was entered for the plaintiff accordingly, and the case comes here by writ of error sued out by the defendant.

Hereafter the plaintiff below will be referred to as the plaintiff, and the defendant below as the defendant.

B. M. Ambler, of Parkersburg, W. Va., and B. A. Richmond, of Cumberland, Md., for plaintiff in error.

Fred. O. Blue, of Charleston, W. Va., and John T. Harris, of Harrisonburg, Va. (Sipe & Harris, of Harrisonburg, Va., and Daugherty & Todd, of Columbus, Ohio, on the briefs), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and BOYD, District Judge.

·BOYD, District Judge (after stating the facts as above). Having outlined the general facts in this case, we do not deem it necessary to go into details in this statement, because we shall take the liberty, in the course of our discussion of the points involved, of referring further to facts found in the record, and which may have a bearing upon the several propositions to be considered. There are many exceptions and assignments of error presented in the record, but the several points to be passed upon may be included under five separate heads.

First, it is alleged that in the course of the work a substance called "gumbo" or "bull-wax" was encountered by the contractors, and which had to be excavated and handled by them in carrying out the terms of the contract. This substance, it is insisted, was not specifically included in the contract, but was unusual and of a character which rendered it very difficult and expensive to excavate and remove, and compensation is demanded for this work. The second question pertains to alleged additional work which it became necessary for the contractors to perform by reason of a change of some part of the line of the railway after the bid of the contractors was accepted and the agreement entered into. The third question concerns what is known as overhauls; that is, overhauls for the removal of the substances excavated beyond the limit of distance set out in the contract. Fourth, the question of retained percentages and forfeitures; and, lastly, the question of jurisdiction of the court, it being insisted by the defendant that this receiver appointed in a foreign jurisdiction had no right to bring his suit in the United States Court for the Northern District of West Virginia, and further that Samuel Walton, a member of the firm of Walton, Purcell, Moorman & Co. was at the

time of the bringing of the suit a citizen and resident of the state of West Virginia.

[1] The question which arises upon the first proposition is by far the more important, because the amount allowed by the jury in the verdict was composed very largely of compensation for excavating and removing this substance at several places in which it was found in the course of the work by the contractors. At the close of the testimony the defendant's counsel requested the court to instruct the jury as follows:

"The court further instructs the jury that by the terms of the contract in evidence the parties agreed upon a definition and a price for the several classes of material named in the contract and classified, among other things, as follows: 'Earth is covered by clay, sand, gravel, loam, and all earthy materials, containing loose stones and boulders of not over three cubic feet.' And the contract further provided that all earth should be excavated at twenty cents per cubic yard.

"And if the jury find from the evidence that there was a material excavated by the contractors, which was tough, plastic, sticky substance and earthy material, which contained no stones or boulders or rock of any kind, then the same was earth, unless the engineers classified it as a higher material at a higher price; but the fact that the defendant's engineers classified it at such higher price or higher classification would not permit or authorize the jury to deprive the defendant of the benefit of its contract, or to increase the allowance over and above what the engineers fixed in their classification and estimates of such material."

The court declined to give this instruction, but made a ruling in the following language:

"That the question of whether gumbo or bull-wax comes under either of three classifications of earth, loose rock, or solid rock, as defined by the contract, or was wholly outside of either, and without the contemplation of the parties, was a question of fact, and evidence was admissible tending to show what gumbo was, and whether or not embraced in either of the three classifications, or whether or not wholly without contemplation of the parties."

It may be stated that the second paragraph of defendant's request for instructions is based upon the fact that during the progress of the work the contractors sought compensation beyond that specifically set forth in the contract for the work in connection with the excavation and removal of the "gumbo" or "bull-wax," and thereupon the engineers classified in their estimates the said substance, much of it as loose rock and solid rock, and the work in connection with it was paid for by the defendant upon this classification.

Returning to the requested instruction of the defendant, and the ruling made by the court, we think there was error in the action of the court, and that any allowances in respect to the substance under consideration beyond that made by the classification and estimates of the engineers was unwarranted. In the contract the substances to be dealt with in the work to be performed by the contractors are described under three heads, namely, earth, loose rock, and solid rock, *and then the contract goes on and provides that earth shall cover all clay, sand, gravel, loam, and all earthy materials containing loose stones and boulders of not over three cubic feet.* Loose rock covered:

"All stones in adjoining, but detached, masses of over three cubic feet, but not over one cubic yard, in size; also all slate and other rock which

can be quarried without blasting, although blasting may be resorted to; also cemented gravel, which must be blasted."

Solid rock was stipulated to cover:

"All rock in masses of over one cubic yard which cannot be removed without blasting."

The prices contracted to be paid per cubic yard were, for earth 20¼ cents per cubic yard, loose rock 35 cents per cubic yard, solid rock 68 cents per cubic yard, with the stipulation that the average haul should not be over 800 feet.

Webster's definition of "earth":

"The solid materials which make up the globe, in distinction from the air or water; the dry land."

It is very clear to us why the contract stipulated different prices per cubic yard for the substances severally described, for if nothing further had been said, the term "earth" included everything which goes to constitute the globe, except water; and the reason that loose rock and solid rock were separately described under this head was, as is seen by the contract, that for work in respect to these two a greater price should be paid, leaving all other substances to be encountered to be included in the term "earth."

As stated before, however, it is shown by the record that the engineers did take into consideration the character of this substance, and went beyond the price limit in the contract, and classified "gumbo" or "bull-wax," much of it as loose rock, and some of it as solid rock, and the railway company acquiesced in this classification and paid the contractors upon that basis, and for this cause the plaintiff insists that this concession was an admission by the defendant that the substance under consideration was not included in the contract; but we cannot see that the action of the engineers, and of the defendant, in this respect ought to result in detriment to the defendant, for although the engineers may have concluded that the bargain made by the contractors was in some respects a hard one, and the defendant, realizing such to be the case, dealt generously with the contractors, this does not, in our opinion, abrogate the specific terms of the contract itself. In our view of the case the defendant was entitled to the first paragraph of the instructions as hereinbefore set out, and that it was error in the court to refuse it.

[2] It is insisted, however, by the plaintiff, and testimony was admitted by the court to the effect, that the engineers verbally promised or agreed that the excavations of "gumbo" should be paid for at a better price than that provided by the contract; but when we examine the contract we see a specific stipulation as follows:

"This contract shall not be affected by any verbal agreement or inferences drawn from conversations had upon the subject."

Under the express terms of the contract the defendant could not be bound by any such promise or agreement, if the same was made. The defendant, therefore, was entitled to the second request above, and the action of the court in refusing it we think was error. Bearing on the question raised by the last position of the plaintiff, that

there was a verbal agreement respecting the excavation of the "gum-bo," the defendant requested the court to instruct the jury as follows:

"The court instructs the jury that by the terms of the contract in evidence the contract shall not be affected by any verbal agreement or inference drawn from conversations had upon the subject; and if the jury find from the evidence that the consulting engineer, or any other engineer of the de-fendant, stated or promised orally to J. T. Adams, one of the subcontractors engaged on this work, that he should have an extra allowance over and above what was allowed by the engineers upon the classification or estimates made by them, on account of any work or excavation done by him, the de-fendant cannot be charged or made liable in this action by reason of any such promise or agreement, if any was made to said Adams."

This request was also refused by the court, and an assignment of error is based upon such refusal. Plaintiff's counsel insist that the case of Henderson Bridge Co. v. McGrath, 134 U. S. 260, 10 Sup. Ct. 730, 33 L. Ed. 934, is authority sustaining the court in this action. We do not see that the case is in point. In that case there was no formal written contract executed between the parties; but the origi-nal agreement was based on specifications and profile of the work to be done on the part of the company, and proposals on the part of the contractor, which were accepted by the company. There was after-wards a modification of the original specifications and profile, and the question presented for decision was whether the modified specifica-tions and profile came within the original contract, or created a feature in the work done so differently from that originally contracted for as to constitute a new contract. The court decided that this question was properly referred to the jury to determine, and the further question was whether under the circumstances of this case the local engineers of the company, who made the change in the specifications and pro-file, and agreed with the contractors that they should be paid for the work under the new arrangement, had the power to bind the company. The court held that they did, and held, further, that as there was no agreement to pay a fixed price that the contractors were entitled to recover what the work was reasonably worth.

The other case relied upon by plaintiff as a ground for the refusal of the court to give the instruction is Salt Lake City v. Smith, 104 Fed. 457, 43 C. C. A. 637. This case is also, in our opinion, based upon entirely different conditions from those existing in that under consideration. The case was a contract entered into by contractors with Salt Lake City to furnish materials and perform the necessary work, except that required to make the excavations, to construct a covered conduit for the purpose of leading the waters of Parley's creek to Salt Lake City, a distance of about six miles. There was an ap-proximate estimate of the quantities made in the instructions to the bidders, which included tunneling in earth, tunneling in solid rock, concrete masonry, brick masonry, cut stone masonry, etc. There was nothing in the specifications to indicate that the bidders were required to build a dam across Parley's creek, or to construct any wells or cis-terns. After the contractors commenced to construct the conduit be-ginning at Salt Lake City and advanced towards Parley's Canon, the line of conduit for the last mile was materially changed by the city engineer from comparatively level ground to a course over deep ra-

vines and through hills, which required expensive tunnels, the lining of such tunnels at great expense with concrete masonry, the laying of heavy iron pipes therein, and the construction of large and expen-' sive cut stone culverts, which would not have been necessary if the line and plan of the work had not been changed. The court held in this case very properly that the contractors were entitled to recover upon a quantum meruit, because of the fact that there had been such a material change in the line of the work, and character and cost of the work, as to create a new contract. No such conditions have been disclosed in the case before us, and we think this last-named case, instead of being authority for the plaintiff, sustains our view, when it says:

"The great desideratum and the real end to be attained by the construction of a contract is to ascertain the terms upon which the minds of the parties met, and the sense in which they were used when the parties made the agreement."

It is our view that the minds of the parties to the contract involved in this case met upon the terms set forth in the written instrument, which are sufficiently explicit and unambiguous to fully warrant the conclusion that all classes of material to be encountered by the contractors in the construction of the work were included, and at the specific prices named.

Whilst we think we have disposed of this question, yet we may say that, even if it had been an issue of fact as to whether or not this substance called "gumbo" or "bull-wax" was included within the terms of the contract, the testimony which we gather from the record is overwhelmingly to the effect that it was a species of clay. William A. Hall, who was examined as a witness for the defendant, and who was shown to have been a graduate of the United States Military Academy, and who had been engaged in the work of civil engineering for 25 years, testified that he had examined this substance, and that it was earth and clay, and at some places there was earth and small stones intermixed with clay; that it had a soapy and sticky feeling to it; was undoubtedly tough; that it was hard to pull apart, and would not fracture easily; that he had discovered similar materials in excavations on the Clinch Valley Division of the Norfolk & Western Railway. I. C. White, official state geologist of West Virginia, was examined. This witness, who was the author of a book on clays, cements, and limestones, testified that he had examined the substance in controversy. He said it was a kind of clay, and, like all clays, more or less sticky and tough; but, as we have before stated, we do not think it was a question for the jury, but that the court should have construed the contract and declared what it meant, for as we see it there was nothing indefinite or uncertain about the terms, especially as respects the several kinds of matter and substances to be dealt with by the contractors, and the prices severally to be paid therefor.

[3] Authority is plentiful that unexpected difficulties which a contractor encounters in the performance of a particular piece of work at a stated price does not excuse him from the obligation of his contract. In support of this proposition may be cited the authorities referred to

by the defendant's counsel in his brief, namely, United States v. Glea-son, 175 U. S. 588, 20 Sup. Ct. 228, 44 L. Ed. 284, Simpson v. United States, 172 U. S. 372, 19 Sup. Ct. 212, 43 L. Ed. 482, and McCormick v. Jordon, 65 W. Va. 86, 63 S. E. 778. The contract under which the bid of the contractors was accepted contained the following provision:

"Any one bidding on this work is expected to visit the line and examine it thoroughly, and a statement to that effect must be made in the proposal. It is also understood that any estimate of quantities submitted to bidders by the railway company is only approximate."

We have, therefore, the right to assume that the contractors, at the time they entered into the agreement with the defendant, fully understood the nature and character of the work they were to perform. They no doubt had knowledge of the country which was to be traversed by the line of railway contemplated, and they made the bid which was accepted by the defendant at the price named, intending to include all such work as was necessary to carry out the contract. As we have said, the contract is plain and unambiguous in its terms, and should be permitted to speak for itself. We think it was error, therefore, for the court at the instance of one of the parties, in the absence of allegations of fraud or mutual mistake of facts, to admit parol testimony which tended to alter or contradict the terms of the contract itself, or to submit to the jury an issue to determine what the contract meant.

[4] The second question—that is, the claim for compensation for additional work made necessary by reason of a change in some part of the line of the railway—will now be considered and disposed of. The contract provides as follows:

"The alignment, grades, and disposition of material may be changed from the plans at present existing, without prejudice to this agreement. If it can be shown to the satisfaction of the engineer in charge and the consulting engineer that such changes will add to the cost per cubic yard of excavation handled, then such extra allowance may be made by the consulting engineer as will reimburse the contractor; but should the said change decrease the cost of the work to the contractor, he shall be charged with the difference. Any such changes shall be embodied in a supplementary agreement."

There was no supplementary agreement made between the parties to the contract, and so far as the record shows no claim for extra work was ever filed by the contractors. Of course, technically speaking, the contractors should bring themselves within the terms of the contract before they are entitled to recover under it; but we do not deem it necessary under the circumstances of this case to rely upon that principle, for the undisputed facts show that the alleged extra work done by the contractors upon the changed line, which was made by the engineers, was carried on, conducted, estimated, classified, and paid for by the defendant precisely as was work done upon other parts of the line, and such payment was accepted at the time by the contractors.

The work on the first division was completed and certified by the consulting engineer and the engineer in charge on the 8th of August, 1901, the work upon the second division was completed and accepted February 2, 1903, and the work upon the third division on November

30, 1902. As appears from the record, the contractors sublet much of the work on the line, and divided the line into sections to suit the subcontractors. At the instance of the contractors themselves, the engineers, instead of estimating the entire work, classified and estimated the several subdivisions as the work progressed and was finished, and thereupon the payments were made by the defendant to the contractors in accordance with the classification made by the engineers, and at the price named in the contract, except as to the gumbo, which, as is before stated, was much of it classified at a higher rate than earth as defined in the contract, namely, as loose rock and solid rock, as has hereinbefore been set out. It is true that during the progress of the work the contractors were contending for higher prices for some classes of it, particularly for the gumbo or bull-wax which was excavated, and the record of testimony shows that there was considerable chaffering between the contractors and the subcontractors and the engineers relative to the work and the prices to be paid; but the engineers made their estimates and classified the work, and thereupon the defendant paid according to these classifications and estimates, and, as we have said, the payments were accepted by the contractors.

In support of the position that the plaintiff is entitled to go behind the estimates and classification made by the engineers, and to recover from the defendant additional compensation for the work, the two cases of Jefferson Hotel Co. v. Brumbaugh et al., 168 Fed. 867, 94 C. C. A. 279, and City of Greensboro v. Southern Paving Construction Co., 168 Fed. 880, 94 C. C. A. 292, are relied upon. Both of these cases were decided by this court. In the first-named case it was held that:

"Where a building contract constituted the architects the owner's supervising agents, but did not in terms authorize the architects to issue a conclusive final certificate, an architect's final certificate was only prima facie evidence that the work had been performed according to the contract, and placed the burden of proof on the owner to impeach the same for error, mistake, omission, or concealment."

And in the second case that:

"A contract for street paving required the work to be done as a whole, and not in sections, according to specifications under the direction of the city's engineer. The notice to bidders and specifications alone provided for payment on semimonthly estimates as the work progressed, with a retention of 10 per cent. on each 'approximate estimate.' The contract also provided that the contractor should be responsible for any work until its completion and final acceptance, and that the acceptance should not relieve the contractor of any obligations to do reliable work previously described. Held, that the word 'approximate' was tautologically used to accentuate the word 'estimate,' which was not to be construed as a final mathematical ascertainment of what was set forth; and hence the acceptance of sections of the work by the city engineer and issuance of approximate estimates thereon to the contractor did not bar the city's right to defend, when sued for the balance due under the contract, on the ground that the work in the section estimated did not constitute a compliance with the specifications."

But the contract in the case here contains provisions which are much more emphatic with respect to the effect of the estimates and classifications made by the engineers than are to be found in the cases re-

ferred to. We copy from the contract in this case the following stipulations:

"On the last day of each month during the progress of the work an estimate shall be made of the value of all work done, by the engineer in charge, to date."

"All claims for extra work must be filed before the end of the month during which the work was done, and shall at once be adjusted.

"And it is mutually agreed that the decision of the consulting engineer shall be final and conclusive in any dispute which may arise between the parties to this agreement, and each and every one of the said parties do hereby waive any right of action, suit or suits, or other remedy in law or otherwise, by virtue of said covenants, so that the decision of the said consulting engineer shall, in the nature of an award, be final and conclusive on the right and claim of said parties."

And we find also in the contract the following provision:

"The contractor agrees to do all the work described to the satisfaction of the engineer in charge and consulting engineer, and to accept their decision as to quantities, classification, 'etc.,' as final, and from which no appeal shall be taken."

We think the case of Martinsburg & Potomac Railroad Co. v. March, 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. Ed. 255, has clearly drawn the distinction between the class of contracts involved in the Greensboro Case, and the Jefferson Case, and the contract now under consideration. In that case the Supreme Court of the United States holds that:

"A contract for the construction of a railroad provided that the company's engineer should in all cases determine questions relating to its execution, including the quantity of the several kinds of work to be done, and the compensation earned by the contractor at the rates specified; that his estimate should be final and conclusive: and that 'whenever the contract shall be completely performed on the part of the contractor, and the said engineer shall certify the same in writing under his hand, together with his estimate aforesaid, the company shall, within thirty days after the receipt of said certificate, pay to the said contractor, in current notes, the sum which according to his contract shall be due.' Held, that in the absence of fraud, or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, the action of the engineer in the premises was conclusive upon the parties."

In view of the provisions of the contract it seems to us that unless it was shown that there was fraud, or such gross mistake on the part of the engineers as would necessarily imply bad faith, or a failure on their part to exercise an honest judgment, their action was conclusive and binding upon the parties. Upon examination of the entire record we are unable to find any evidence that the action of the engineers in connection with the work under the contract between the contractors and the defendant was other than that prompted by fairness, good faith, and a desire to deal justly with both parties. There is no allegation made by the plaintiff of fraud or bad faith on the part of the engineers in estimating and classifying any part of the work, either that performed by the contractors themselves, or by those to whom portions of the work were sublet. In Cook v. Foley, 152 Fed. 41, 81 C. C. A. 237, it is held that final measurements and classification of work made by engineers under a contract providing that they shall

be conclusive are in legal effect an award made by arbiters, in the absence of fraud or of such gross mistakes as imply bad faith or a failure to exercise an honest judgment. A number of cases might be cited to sustain this principle, but we do not deem it necessary to refer to them specifically. The testimony introduced by the plaintiff on the trial to undo the estimates made by the engineers during the progress of the work was that of engineers who had examined the work long after it was completed, and on such examinations based their estimates. It is well said by the Court of Appeals of Virginia in the case of Baltimore & Ohio Railroad Co. v. Polly, Woods & Co., 55 Va. 447:

"Contracts for railroads usually contain provisions with regard to monthly and final estimates to be made by the *engineer having charge of the work*, They are dictated by convenience, if not by necessity. It is the duty, and to the interest of the proprietors to employ honest and competent engineers. An honest engineer in charge is certainly a most suitable person to estimate. * * * He can do it with almost perfect accuracy. He superintends the entire progress. He cannot classify and accurately measure the varied material after the work is done and the excavated material or most of it covered up. It is impossible for *any other person*, even the most competent engineer, to estimate the quantity, character, and value with anything like accuracy."

From our line of discussion it will be readily observed that we are of the opinion that under the facts and circumstances of this case it was error to go behind the action of the engineers with reference to the classification and estimates of the work done by the contractors on the defendant's railway, and thereby open the way for a jury, by its verdict, to practically annul the contract between the contractors and the defendant.

[5] The third question, which has reference to the claim of the plaintiff for what are called overhauls made by the contractors in the course of the work, will be disposed of upon the grounds which we have already assigned relative to the other part of the work. We will say, however, that the contract provided for a haul of 800 feet, and it should be remembered that, although the work covered by the contract was divided into three divisions, yet the defendant was dealing with the contractors for the entire line, and undoubtedly the provision as to the haul and overhaul was to maintain an average within the limit provided for the entire line. Any other method of estimating this part of the work would, therefore, be contrary to the terms of the contract. It is shown by the record that the work in connection with the overhauls was also estimated and certified by the engineers, as was the other work, and the payment therefor, according to the estimates, made by the defendant to the contractors.

[6] The defendant's counsel requested an instruction by the court to the jury based upon this view of the contract; but the court refused the instruction so requested, and gave the following instead:

"The court instructs the jury, in determining the amount, if any, to be allowed the plaintiff for overhaul, they may consider the evidence offered in aid of the interpretation of the contract between the parties; and if they believe from a preponderance of all the evidence that under the contract the defendant agreed to pay the plaintiff for overhaul, they may allow therefor such amount as they believe the plaintiff entitled to as shown by the evidence."

We are unable to see how evidence in aid of the *interpretation* of the contract between the parties was relevant in respect to this matter, for upon an examination of the contract it will be seen that the provision concerning the haul and overhaul is altogether plain and definite. It was error, therefore, as we conclude, to admit testimony tending to explain or vary the terms of the contract, or to submit to the jury such testimony. We take the liberty of citing in this connection two other cases in support of the views we have expressed, to wit: The case of Vanderwerker et al. v. Vermont Central Railroad Co., 27 Vt. 130, in which it is announced that:

"After an estimate by the engineer, no recovery could be had beyond that sum, unless upon the most irrefragable proof of mistake of fact or positive fraud in opposite parties in procuring an underestimate or corruption in the engineer."

And in Choctaw Railroad Co. v. Newton, 71 C. C. A. 655, 140 Fed. 225, it is held that:

"A railroad contractor cannot impeach the decision of such engineer and recover an amount in excess of that shown in his decision, except on a clear showing of fraud, * * * and that a direction to a master that, to warrant a finding of fraud in such decision, the evidence must be *reasonably convincing*, does not come up to the measure of proof required."

[7] Coming to the question of retained percentages, the contract provides that:

"On the last day of each month during the progress of the work an estimate shall be made of the value of all work done, by the engineer in charge, to date. Of this amount ninety per cent. shall be paid to the party of the second part, less any previous monthly estimates which might have been paid on the same work; said payments shall be made on or about the 15th of the following month. And when all the work embraced under this agreement shall be completed, according to this specification and to the satisfaction of the engineer in charge and the consulting engineer, a final estimate shall be made, and any balance appearing to be due to the party of the second part shall be paid within thirty days thereafter," etc.

It is admitted that the sum retained by the defendant under this part of the contract amounted at the close of the work to $17,-079.89. The defendant contests plaintiff's right to recover this sum, and sets up a right of recoupment for a much larger amount under this paragraph of the contract:

"And it is further understood that for each day and every day required in excess of the date named for the completion of this contract the sum of fifty dollars shall be paid by the party of the second part to the party of the first part, which shall be considered as liquidated damages. Or should the party of the second part anticipate the date of the completion, then the party of the first part shall pay to the party of the second part fifty dollars for every day so saved."

The contract required that the work on the first division should be performed in a thorough and workmanlike manner on or before the 15th of December, 1900, and on divisions 2 and 3 on or before the 1st of March, 1901. As has been stated before in the course of this opinion, the work on the first division was completed on the 8th of August, 1901, on the third division on the 30th of November, 1902, and on the second division not until February 2, 1903. To hold the con-

tractors liable for the penalty provided in the contract for all of the time in excess of that limited for the performance of the work would make a much larger sum than the retained percentages amount to. If the defendant, through its engineers, exercised the authority conferred upon them by the contract, and by changing the line of railway, or otherwise required additional work of the contractors, which would take an enlargement of the time, then it would necessarily follow that the law would give the latter a reasonable extension in which to perform such additional work, and there would be no forfeiture if only such reasonable time was occupied. We do not think, however, that the mere fact that there was additional work required would warrant the contractors in making unnecessary delay in the completion of the contract. We find some valuable learning on this subject in the opinion of the Circuit Court of the Eastern District of Arkansas in the case of Texas & St. Louis Railway Co. v. Rust et al., reported in 19 Fed. 239. From the syllabus of the case we copy the following:

"A provision in a contract to build a railroad bridge that, in case of non-completion of the bridge or providing a crossing for trains by a given date, the sum of $1,000 per week should be deducted from the contract price of the bridge for the time its completion or provision for crossing trains is delayed beyond that date, is a stipulation for liquidated damages."

"In such cases, if the contractors act in good faith, and the delay results from causes beyond their control, they will not be liable for damages in excess of the stipulated amount."

"The fact that the contractors were retarded in the work by high water, sickness of hands, and sunken logs encountered in sinking piers, does not excuse them from performance of their contract. They assumed their risks when they executed the contract, without a provision exempting them from the consequences of such casualties."

In the course of the opinion the court expresses itself in this language, which is in accord with our views upon the subject:

"If the plaintiffs directed the defendants to make additions or changes, or do work on the bridge not covered by the contract, and which would require longer time to complete the bridge, and this fact was known to both parties, then it must be implied that both parties consented to such an extension of time as was necessary or reasonable for making such additions or changes, but no more. Manufg. Co. v. U. S., 17 Wall. 592 [21 L. Ed. 715]. If such orders for additions or changes in the bridge were given by the plaintiff, and the defendants with good faith and with reasonable diligence and adequate force and appliances, performed such extra work, then the time required to do the same must be added to the contract time allowed for completion of the bridge."

The case of Manufacturing Co. v. United States, 17 Wall, 592, 21 L. Ed. 715, noted in the foregoing involves also the same principle. The case of American Bridge Co. v. Camden Interstate Railway Co., 135 Fed. 323, 68 C. C. A. 131, decided by this court, treats more particularly of the rule of damages in cases where a contract has not been completed by the contractors within the time limited, or where the contractors unnecessarily delayed in finishing the work they had agreed to perform. The principle; however, that such damages are recoverable where the default of the contractor causes the delay, is fully recognized in that case. Upon this subject the learned trial

judge instructed the jury that, in order to hold the contractors liable for the forfeiture under the provisions of the contract, it must appear that the delay in the completion of the work was wholly due to their fault. Thus far we think the court announced the true principle, but the court added the following paragraph:

"And the court further instructs the jury if they believe the preponderance of the evidence shows that the delay, if any, was caused by the defendant company materially changing the line, after the time of the execution of the contract, and that such change in the line, either by materially increasing the amount and quantity of material to be excavated and removed, or by materially increasing the difficulty of removing said material encountered on said changed line, increased the length of time necessarily required for the contractors to complete said work, then the defendant is not entitled to recover under its said notice of recoupment."

We think it was due the defendant after this delivery that the court should have proceeded and instructed the jury on the line we have above indicated; otherwise, the jury was left to conclude from the language of this last instruction that the fact that the defendant had enlarged the scope of the work absolved the contractors from further obligation to be diligent in its performance. The proposition as we state it is the law as we understand it, and it was error prejudicial to the rights of the defendant for the jury to take the case without being advised that although the defendant by realignment or otherwise had increased the work which would necessarily require more time, yet when a reasonable time had elapsed for the contractors to complete the increased work, and they had, by want of diligence, proper preparation, the use of a competent force, or by other default, failed to do so, then they would be liable for the forfeiture for delays beyond the reasonable limit of time. The right of the defendant in case forfeiture was found against the contractors to avail of it by way of recoupment for the reduction or extinguishment of the retained percentages is undisputed.

As to the questions we have so far considered we think the theories adopted by the trial court as portrayed by the rulings made and the instructions given to the jury were at variance with the specific agreements of the parties as set out in the written contract and were to this extent, as we have expressed ourselves, erroneous as propositions of law. Defendant's requested instructions, which were refused, and exceptions to the instructions given are numerous, and cover every point which arises in the case. We do not think it necessary, however, to deal with these matters further in detail. We deem it sufficient to say that aside from the claim for retained percentages the plaintiff was not entitled to recover, and as to these the issue should be submitted and tried upon the principles we have above announced.

[8] Finally, we are called upon to consider the question of jurisdiction, which is raised by the defendant below, and is based upon the ground that Reherd, the plaintiff, having been appointed receiver by a court of the state of Virginia, had no right to come into the state of West Virginia and bring his suit in the Circuit Court of the United States as it then existed.

204 F.—56

In his last work on Receivers (fourth edition, published in 1910), Mr. High, on page 271, says:

"Upon the question of the territorial extent of a receiver's jurisdiction and powers, for the purpose of instituting actions connected with his receivership, the prevailing doctrine, established by the Supreme Court of the United States and sustained by the weight of authority in various states, is that the receiver has no extraterritorial jurisdiction or power of official action, and cannot, as a matter of right, go into a foreign state or jurisdiction and there institute a suit for the recovery of demands due to the person or estate subject to his receivership. His functions and powers, for the purpose of litigation, are held to be limited to the courts of the state within which he was appointed, and the principles of comity between nations and states, which recognize the judicial decisions of one tribunal as conclusive in another, do not apply to such a case, and will not warrant a receiver in bringing an action in a foreign court or jurisdiction."

Among the authorities cited by the author to sustain the above principle we note the following: Booth v. Clark, 17 How. 322, 15 L. Ed. 164; Hale v. Allinson, 188 U. S. 56, 23 Sup. Ct. 244, 47 L. Ed. 380; Great Western Mining & M. Co. v. Harris, 198 U. S. 561, 25 Sup. Ct. 770, 49 L. Ed. 1163.

[9] It seems to be settled, therefore, that this receiver, who was appointed in a Virginia court, was not authorized in the outset to institute his action in the United States Court in the Northern District of West Virginia; but the plaintiff undoubtedly, from his subsequent action, undertook to cure this defect by going into Randolph county, W. Va., after the suit had been begun, and filing an ancillary bill, under which an order ratifying his appointment as receiver was made, in which said order are the following provisions:

"* * * And with authority to him to intervene and prosecute as party plaintiff, and as receiver, as hereinbefore described, in the action of assumpsit pending in the Circuit Court of the United States for the Northern District of West Virginia, entitled Peter W. Reherd, Receiver, v. Coal & Iron Railroad; and he shall have full authority as receiver, appointed by this court, to intervene as party plaintiff in said action, according to the rules of pleading in the Circuit Court of the United States for the Northern District of West Virginia."

The question then presented is as to whether this proceeding, taken after the suit had been actually instituted, would have the effect for which it was intended. It occurs to us that in this situation the position of the defendant becomes one of extreme technicality. Undoubtedly, if the plaintiff had filed his ancillary bill in the state court of Randolph county, W. Va., and his appointment as receiver had been ratified, and authority given to bring the suit, the proceeding herein would have been regular and the question of jurisdiction eliminated.

Our conclusion is that although the proceeding was irregular, yet when the plaintiff came into the United States court, under the order of the West Virginia state court, and constituted himself a party, and the pleadings and subsequent proceedings made to conform, that in effect was a commencement of this suit de novo.

Under the circumstances of this case, after all the facts have been fully considered by a court and a jury, consuming no doubt much

time and a large expenditure of money, we are not inclined, and it would in our opinion be unwarranted, to respond to the defendant's position, which involves, as we have said, a mere technicality based upon an irregular proceeding, and such action on our part would not only greatly militate against the interests of the parties to this action, but would also tend to unnecessarily retard the administration of justice.

[10] The defendant then suggests that Samuel Walton, one of the members of the firm of Walton, Purcell, Moorman & Co., is and was a resident of the state of West Virginia, and that upon this ground the jurisdiction of the federal court is ousted. The residence of the several individual members of the partnership does not in our opinion enter into the determination of the question of jurisdiction. When the plaintiff was made the arm of the Virginia court as its receiver to collect and take in hand the assets of the partnership, he was by the law constituted the sole actor in such litigation as pertained to the partnership assets, although, as we have stated, his right to sue was confined primarily to the territorial limits of the jurisdiction in which he was appointed. Walton is not a party to the suit, nor indeed is he a necessary or proper party, to the end that a complete determination of the controversy between the plaintiff and the defendant may be had.

In the case of Coal Co. v. Blatchford, 11 Wall. 172, 20 L. Ed. 179, Mr. Justice Field, in delivering the opinion of the court treats of this subject, and in speaking of executors and trustees says:

"If they are personally qualified by their citizenship to bring suit in the federal courts, the jurisdiction is not defeated by the fact that the parties whom they represent may be disqualified."

We think this rule applies also to receivers, and therefore there is no force in this last position of defendant's counsel.

The judgment of the District Court will therefore be reversed, and the case remanded, to the end that a new trial may be had, to be proceeded with in accordance with this opinion.

Reversed.

PRITCHARD, Circuit Judge (dissenting). A careful consideration of the facts and circumstances surrounding this case impels me to dissent from the conclusion reached by the majority of the court in this instance.

It is fundamental that, in all cases where contracts are entered into, there must be a meeting of the minds of the parties thereto. It is evident that, at the time these contracts were made the material known as "gumbo" or "bull-wax" was not supposed to exist in the state of West Virginia; hence it could not have been anticipated by the parties that such material would be encountered in the performance of this work. Therefore it cannot be reasonably insisted that that portion of the contract which refers to sand, clay, and gravel was intended by the parties to include an extraordinary material of this character, the removal of which, as shown by the evidence, cost far in excess of the removal of even solid rock, to say nothing of the

other material referred to in the contract. The evidence shows that the removal of this substance involved an expenditure of over $100,-000 in excess of the amount that would have been required for the performance of the work in question, dealing with ordinary material, without even considering the cost incident to the purchase and transportation of additional machinery necessary to be used in excavation where material of this character is encountered. The engineer representing the company recognized this fact, and gave assurances to the contractor that a fair adjustment would be made if he continued the work to its completion.

In view of the facts, I am of the opinion that the rulings of the lower court were correct, and that the questions of fact which I think are pertinent to the correct determination of the matters involved in this controversy were fairly and impartially submitted to and passed upon by the jury. Under the circumstances, I feel that substantial justice has been done, and that the judgment of the lower court should not be disturbed.