Robert J. WAGONER, Appellant
(Defendant below),
A. F. Allard, (Defendant below),

v.

TURPIN PARK IRRIGATION CO., a corporation, Appellee (Plaintiff below).

No. 3967.

Supreme Court of Wyoming.

Oct. 8, 1971.

Gordon W. Davis, of Davis & Costin, Laramie, for appellant.

Edward T. Lazear, of Loomis, Lazear, Wilson & Pickett, Cheyenne, Harold M. Johnson, Rawlins, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GRAY, JJ.

Mr. Justice GRAY delivered the opinion of the court.

The within action was commenced on December 6, 1956, by the plaintiff's filing of a petition for a declaratory judgment seeking a determination of the rights of the plaintiff to terminate a contract theretofore entered into by the plaintiff with the defendant, Robert J. Wagoner, for the construction of a reservoir and related ditches in the Medicine Bow Mountain area. After some initial maneuvering the defendant answered and by way of a counterclaim asserted that he had been damaged in the sum of $49,918.58 by a breach of the contract and further asserted in eleven separately stated subparagraphs that he had performed certain specifically described work for which he had not been paid in the approximate sum of $35,886, which amount was later increased. Thereafter the district court on motion of the plaintiff struck from defendant's counterclaim the amount claimed for breach of contract, and it seems to be conceded that the action came on for trial by the district court sitting without a jury on defendant's counterclaim of work performed for which he claimed he had not been paid. The district court in its Findings of Fact and Conclusions of Law in essence concluded that plaintiff had not wrongfully terminated the contract; that there was a failure of proof by the defendant to support by substantial evidence seven of its separately stated and specifically described items of work in the approximate sum of $36,-835, which would be disallowed; that three of the claims for extra cement and the laying of pipe in the sum of $926.80 was for "extra work" approved by plaintiff and should be allowed; and that the ten percent of the estimates withheld by plaintiff in the sum of $1,737.20 should also be paid. Judgment was entered accordingly and defendant has appealed. Plaintiff, on the other hand, has not appealed and has deposited its check in court for payment of the amount found due the defendant.

Most of the circumstances underlying the litigation are not disputed. The record discloses that a group of ranchers in the

area became interested in a project whereby the waters of Turpin Creek could be utilized to firm up their existing water supply. The project envisaged the construction of a reservoir and the two ditches necessary to bring the water to their lands. A corporation was formed and named the Turpin Park Irrigation Co. Application was also made to the Farmers Home Administration for a loan to construct the works and eventually a loan in the sum of $50,000 was approved by F.H.A. and its associated agencies. With the approval of F.H.A. Noah E. Wolford, then county engineer for Carbon County, Wyoming, as well as a licensed engineer, was designated and selected as the "Engineer" for plaintiff's project and prepared the specifications.

Inasmuch as the major portion of defendant's claim and contentions is based upon the presence of so-called "Cemented Gravel" in the ditch identified as the "lower" ditch, it appears advisable to refer to the applicable specifications. Under the portion designated "Earth Work" on the Medicine Bow and Turpin Creek diversion ditches two classifications were set forth. The first, "Earth Excavation," was defined as comprising "all material which can be moved to the spoil bank with a 1 cubic yard power shovel." This was bid by defendant at a unit price of forty cents per cubic yard and accepted by plaintiff. The second, "Solid Rock," was defined as comprising "boulders too large to be moved to the spoil bank without blasting." This was bid by defendant at five dollars per cubic yard and accepted by plaintiff. No other provision was made for "Earth Excavation" and particularly for the so-called "Cemented Gravel." Defendant's bids were submitted on August 30, 1955, and on September 8, 1955, the plaintiff and defendant entered into a written contract which, among other things, provided that the work was to be completed within 120 days after defendant commenced work, unless extended for "unforseeable causes beyond the control and without the fault" of the defendant. It was also provided that plain-

tiff could terminate defendant's right to proceed with the work, take it over and complete the contract if the defendant failed, among other things, diligently to prosecute the work to completion within the time fixed or as extended. Under date of October 17, 1956, the plaintiff by letter served notice on defendant that it was terminating the contract because of defendant's defaults, naming them, and would exercise its contract rights. This was done and the project was completed in 1957. The contract also provided that as the work progressed the engineer, Wolford, would prepare estimates of the quantities of the work performed, apply the "unit price" where bid by the defendant, and submit the same to F.H.A. for review by its engineer. In keeping therewith some nine estimates were made, approved by the engineer for the F.H.A., and paid by plaintiff. Each estimate on the ditches was on the basis of "Earth Excavation" or removal of "Solid Rock." No amount for "Cemented Gravel" was set forth, approved, or paid as such. It was also provided that such estimates would not become final until the work was completed and accepted by Wolford and a final estimate made which was to be checked and approved by the F.H.A. engineer and the engineer of the Soil Conservation Service. That, of course, was never accomplished in strict keeping with the contract because of the termination and the further reason that Wolford in October or November 1956 had been replaced by another engineer. At about that time, however, a survey of the ditches was made by the new engineer for the purpose of determining the amount of earth and rock removed and there was testimony that the result reached was substantially the same as the amounts shown on the nine estimates.

Also, with respect to the defendant's claim for an additional allowance for removal of "Cemented Gravel," the record fails to show that defendant for purposes of his bid made any investigation of soil conditions that he might encounter. That he made none is borne out by his own

testimony wherein he said that neither he nor the plaintiff nor any one else had knowledge of the existence of "Cemented Gravel" in the ditch rights-of-way at the time the contract was entered into. He discovered it in digging the "pit" for the reservoir, which was in the fall of 1955. According to him, he advised Ravenscroft, president of plaintiff, at that time that if they ran into much more of it "They were in trouble" as it could not be removed at the "Dirt Excavation" unit price. In working on the "lower ditch" defendant again ran into it and from his notes testified as to the number of cubic yards of "Cemented Gravel" claimed to have been removed at a unit cost of $2.95 per cubic yard, which he said was the reasonable value of such excavation. He admitted, however, that no agreement on the amounts had ever been reached and Ravenscroft testified that when defendant demanded more money for it he answered, "Well maybe we will have to pay you more; I don't know" but he made no promise to defendant. In any event, although complaining, defendant continued with the work on the ditches and apparently had completed it or nearly so at the time the notice of termination was given.

The record also discloses that in early November 1955 the snow conditions in the area were such that the work could not continue and defendant with the knowledge and consent of plaintiff stopped work and on November 6, 1955, "pulled" his equipment off the mountain. It appears from the within estimates, however, that defendant did some work on the ditches in November and December 1955 and started again in April 1956. He did no work in June, July, or August 1956, but did work in September and October until the ditches were apparently finished. In the interim Ravenscroft on June 13, 1956, wrote a letter to defendant advising defendant that he, Ravenscroft, and the engineers of F. H.A. and the Soil Conservation Service had the day before inspected the site of the work and were of the unanimous opinion that conditions were such that work

on the dam, the reservoir, and the ditches should start immediately and defendant was directed to proceed. With respect to this, there is some discrepancy between what the documents show and the conflicting testimony as to when defendant did or did not start work again, but recognizing, as we do, that memories of detail over a span of years are dulled we will for purposes here rely principally on the written estimates made from time to time as the work progressed and the letter of June 13, 1956.

After a careful review of the record and a reading and rereading of defendant's brief, we must confess that we have encountered difficulty in tying down the points on which defendant relies for reversal of the judgment. In defendant's brief, however, it is said there are three questions germane to the appeal which are:

"1. Did Wagoner fail to complete the contract within the time provided in the contract?

"2. If the answer to Question 1 is 'yes', did Turpin Park waive its right to terminate the contract for this reason?

"3. Is the Conclusion of Law correct?"

■ Using that as an approach and in answer to the first question, we are of the opinion that the trial court was warranted in holding as it did that defendant failed "to complete the construction within the time periods agreed upon." As disclosed by the record, plaintiff does not question that the time was extended in the late fall of 1955 because of weather conditions despite the fact that defendant had failed to request in writing an extension of time as provided in the contract. Plaintiff does question, however, that by such concession and what followed thereafter it lost the right to terminate the defendant's right to proceed with the work or any part thereof as provided by the contract. With this we agree.

■ Mention has heretofore been made of the nine estimates and plaintiff's letter notice of June 13, 1956, and although it is somewhat difficult to reconcile the diver-

gent conclusions that might reasonably be drawn from the face of the instruments as to just when the defendant did work on the project, it is clear that the project on October 17, 1956—the date of notice of termination—was little more than fifty percent complete. At that time more than 120 days had already gone by from June 13, 1956, when defendant was directed to commence the work "immediately." Having in mind that under the contract the defendant was required "to prosecute the work with such diligence as will insure its completion within the time specified in this contract or any extension thereof," it was apparent on October 17, 1956, that defendant, without lawful excuse, was in default as to time and thus was not in position to complain because plaintiff exercised its contract rights.

In addition we should perhaps point out that the notice of termination set forth other grounds wherein defendant purportedly had failed to live up to his contract, such as the failure to provide the necessary labor which incidentally was established by substantial evidence, and this also was sufficient to warrant the conclusion of the trial judge that plaintiff had not wrongfully terminated the contract.

■ With respect to the matter of waiver raised by the second question, we would simply point out that the contention is not supported by cogent argument or authority and consequently will not be noticed. Stolldorf v. Stolldorf, Wyo., 384 P.2d 969, 973.

■ Turning now to question number three, inquiring as to whether or not the conclusion of law was correct, the conclusion reads as follows:

"That where parties enter into a written construction contract, the terms of the contract are binding on the parties, and no new or additional terms or conditions may be proven or admitted by parol evidence."

Perhaps some further elaboration would have been appropriate, but that is not to say it was necessary. An analysis of the court's "FINDINGS OF FACT AND CONCLUSIONS OF LAW" as a whole readily discloses it had determined that the applicable provisions of the contract relating to "Earth Excavation" were plain and unambiguous and under such circumstances could not be altered by parol evidence. We have often recognized and applied that rule. Chandler-Simpson, Inc., v. Gorrell, Wyo., 464 P.2d 849, 851; Flora Construction Company v. Bridger Valley Electric Association, Inc., Wyo., 355 P.2d 884, 885–886; Bosler v. Coble, 14 Wyo. 423, 84 P. 895, 898. Thus on the basis of what is before us, we are not persuaded that the court erred in its conclusion. We need not dwell upon that question, however, inasmuch as the judgment entered is supported by other reasons.

■ Throughout his brief the defendant centers his argument on the difficulty encountered with the removal of the "Cemented Gravel." We have no way of knowing whether the trial judge disallowed the claim for some $24,670 on the basis of an attempt to alter the contract by parol or as was stated in its finding "That there was a failure of proof and a lack of evidence" to support the claim. In either event, however, and assuming— which we have not—that the ruling was erroneous, the defendant could not have been prejudiced. Although defendant testified that neither he nor the plaintiff was aware of the presence of the "Cemented Gravel" in the lower ditch, we have heretofore pointed out that such testimony quite clearly shows that defendant made no investigation of the soil conditions.

Neither does defendant claim that he was misled in this regard by any representations of the plaintiff or its associates, and there was no evidence that such representations had been made either before or at the time the contract was entered into. Then, too, Ravenscroft testified that he and defendant had "visited a lot about the project and he [defendant] always talked about cemented gravel." In those conversations defendant also told of the work he had done in the mountains and the dams he had built. Ravenscroft then said that

while he didn't know what "Cemented Gravel" was, the defendant "would know about it before he signed the contract; he knew what to expect." Apparently the trial judge agreed with Ravenscroft and no doubt concluded, as we conclude, that defendant had made a bad contract and was then seeking the aid of the court to abrogate the pertinent specific terms. That the courts will not do under the circumstances presented. In Schaffer v. Standard Timber Company, 79 Wyo. 137, 331 P.2d 611, 615, we said:

"* * * A party preparing to consummate a contract cannot be heard to complain if he fails to make reasonably diligent inquiry regarding the facts. * *"

And that principle is applicable here.

There is yet another reason why defendant cannot prevail. His claim is predicated upon the proposition that neither of the two classifications of "Earth Work" embraced the "Cemented Gravel." That we do not accept. In the first instance it was never demonstrated that the material could not be excavated and moved to the spoil bank with "a 1 cubic yard power shovel" as the contract provided. This for the reason, as clearly disclosed by the record, that defendant undertook to excavate the material with a five-eighths cubic yard power shovel. Secondly, of course, we are of the opinion that "Cemented Gravel" fell squarely within the definition of "Earth Excavation." Long prior to this proceeding the existence of such material was known to contractors and identified as "Cemented Gravel." Shephard v. St. Charles Western Plank Road Company, 28 Mo. 373, 376, decided in 1859; and Coal & Iron Ry. Co. v. Reherd, 4 Cir., 204 F. 859, 872, 123 C.C.A. 155, certiorari denied 231 U.S. 745, 34 S.Ct. 319, 51 L.Ed. 464, decided in February 1913. Despite this and his own knowledge, the defendant so far as this record shows, made no effort to protect himself should such contingency arise and proffered no probative testimony tending to prove that the definition in the contract of "Earth Excavation" was not intended by the parties to include "Cemented Gravel." Under those circumstances he can scarcely complain of the results reached by the trial judge. The mere fact that Wolford, realizing that defendant had made a bad contract, juggled his estimates to some extent to alleviate defendant's loss cannot be taken advantage of to reward the defendant and impose further detriment upon the plaintiff. Coal & Iron Ry. Co. v. Reherd, supra.

With respect to the other disallowed items, the defendant voices no specific complaint and again presents no cogent argument. The same is true of the allowed items. Consequently we do not pursue that phase of the case.

For the reasons stated the judgment is affirmed.

Affirmed.